773 F.2d 1087
 The UTE INDIAN TRIBE, Plaintiff-Appellant and Cross-Appellee,
v.
The STATE of UTAH, Defendant-Appellee,
Duchesne County, a political subdivision of the State of
Utah, Roosevelt City, a municipal corporation, Duchesne
City, a municipal corporation, and Uintah County, a
political subdivision of the State of Utah,
Defendants-Appellees and Cross-Appellants.
 Nos. 81-1827, 81-1901.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 17, 1985.
 
 Daniel H. Israel of Cogswell & Wehrle, Denver, Colo., and Martin Seneca, Reston, Va. (Scott B. McElroy and Julian M. Izbiky of Cogswell & Wehrle, Denver, Colo., and Robert Thompson, Fort Duchesne, Utah, with them on brief), for plaintiff-appellant/cross-appellee Ute Indian Tribe.
 Dallin W. Jensen, Sol. Gen., Salt Lake City, Utah (David Wilkinson, Utah Atty. Gen., and Michael M. Quealy, Asst. Atty. Gen., Salt Lake City, Utah, with him on brief), for defendant-appellee State of Utah.
 Tom D. Tobin, Tobin Law Offices, P.C., Winner, S.D. (Dennis L. Draney, Roosevelt City Atty., Roosevelt, Utah, Ronald Uresk, Duchesne City Atty., Roosevelt, Utah, and David Albert Mustone, Tobin Law Offices, P.C., Washington, D.C., with him on brief), for defendants-appellees/cross-appellants Cities and Counties.
 Carol E. Dinkins, Asst. Atty. Gen., Robert L. Klarquist and Martin Green, Dept. of Justice, Washington, D.C., on brief for amicus curiae U.S.
 Before HOLLOWAY, Chief Judge, and SETH, DOYLE, BARRETT, McKAY, LOGAN and SEYMOUR, Circuit Judges.
 ON REHEARING EN BANC
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The above entitled matter was considered by the court en banc on the motion for rehearing. The result was that the majority of the Judges decided that there should be reconsideration and a different result. It will be recalled that in the dissenting opinion which was written previously, this writer agreed with the position which has been taken by District Judge Jenkins (Ute Indian Tribe v. State of Utah, 521 F.Supp. 1072 (D.Utah 1981) ), who generally ruled that the Uintah Reservation and its lands remain the property of the tribes that are involved. As to the questions whether the acts dealing with the Uintah Forest and the Uncompahgre Reservation mean that the Indians lost title to these lands, the view of this writer is contrary to the view of the trial court.
 
 I.
 THE UINTAH ISSUE
 
 2
 With respect to the case against disestablishment, it was even clearer in connection with the Uintah Indian Reservation than the other areas. The district court pointed out in its opinion that the Act of May 5, 1864, 13 Stat. 64, which established the Uintah Reservation provided that "the lands within the Uintah Reservation should be 'set apart for the permanent settlement and exclusive occupation of the Indians.' " 521 F.Supp. 1072 at 1111, quoting H.R.Rep. No. 660, 53d Cong., 2d Sess., 1-3 (1894). The Uintah Reservation was thus clearly established as a permanent home for the Ute Tribe. Considering that Congress' intent to establish and set aside the Uintah Reservation was clearly expressed, disestablishment of that reservation would require an equally clear expression of congressional intent to change the status of the reservation.
 
 
 3
 Recently the Supreme Court decision in Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), clarified that only in two types of situations should courts find that Congress intended to disestablish an Indian reservation. The first of these is when Congress uses explicit language of cession in an opening act and also gives indication of an unconditional commitment to compensate Indians for their opened lands. 104 S.Ct. at 1166. The other situation is "[w]hen events surrounding the passage of a surplus land act-- particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress--unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation...." Id. But neither the intent behind the Indian Appropriations Act of 1905, ch. 1479, 33 Stat. 1048 [hereinafter cited as 1905 Act], that allegedly diminished the Uintah Reservation, nor the language used in that Act, is sufficiently clear to support a finding that the Act disestablished or diminished the Uintah Reservation. Indeed the language used in that Act is sufficiently clear to support a finding that the Act did not disestablish or diminish the Uintah Reservation. Neither the language used in that Act nor any other aspect of it gives clear support for a finding that the Act disestablished or diminished the Uintah Reservation. Nor does the legislative history support the allegation approached.
 
 
 4
 The original opinion, 716 F.2d 1298, in this case inferred, from a series of laws passed between 1902 and 1905, that Congress intended to diminish the size of the Uintah Reservation. The opinion stated that Congress' intent in passing the Indian Appropriations Act of 1902, ch. 888, 32 Stat. 245 [hereinafter cited as 1902 Act], was to disestablish the Reservation and that its original intent carried through to the 1905 Act that actually opened the Reservation to non-Indian settlers. The object of this was certainly different from the conclusion that was set forth. But we now conclude that no intention to alter the Reservation's boundaries was present. Actually the intent was to open the Reservation to non-Indian settlers and this couldn't effect the result that was suggested.
 
 
 5
 The district court's opinion was indeed well researched on this question, and others as well. The 1902 Act would have returned all surplus Uintah Reservation lands to the public domain if the Ute Tribe's consent could be obtained. That consent was never forthcoming. The Tribe refused all requests to give up their lands. As a result of the impasse, Congress passed additional legislation in 1903 and 1904 extending the time set for the opening of the Reservation. See Indian Appropriations Act of 1903, ch. 994, 32 Stat. 982, 997-98; Act of Apr. 21, 1904, ch. 1402, 33 Stat. 189, 207-08. Finally, Congress passed the 1905 Act, opening the Reservation for non-Indian settlement under the homestead and townsite laws. This measure, which actually effected the opening of the Reservation, did not contain the public domain language used in the 1902 Act.
 
 
 6
 It is not possible to find that the series of congressional enactments summarized above revealed a "baseline purpose of disestablishment," 716 F.2d at 1312, that carried through into the 1905 Act. To do so is inconsistent with the Supreme Court's longstanding directive, reiterated in Solem, that in the absence of "substantial and compelling evidence of a congressional intention to diminish Indian lands," the courts' "traditional solicitude for the Indian tribes" must compel a finding that "the old reservation boundaries survived the opening." 104 S.Ct. at 1167. It is impossible to draw disestablishment conclusions or inferences from these congressional statements.
 
 
 7
 An examination of the 1902-1905 series of Congressional enactments with the proper "solicitude for the Indian tribes," Solem 104 S.Ct. at 1167, provides inferences against diminishment. The district court's initial decision that the Uintah Reservation was not disestablished or diminished is correct. The strongest inference that is to be drawn from Congress' actions is that Congress wished surplus Uintah Reservation lands to be put to productive use. With respect to the Reservation's boundaries, the only inference that can be drawn is that Congress had no intention for them to change. Congress' use of "homestead and township acts" language in the 1905 Act, as contrasted with its use of "public domain" language in the 1902 Act, is evidence of a clear retreat from any desire to effect a wholesale diminishment of the Reservation.[1]
 
 
 8
 The original opinion's conclusion that the Uintah Reservation was diminished by the 1905 Act is not correct. Indeed we accept the district court's view that the Reservation's boundaries were not changed by the 1905 Act.
 
 II.
 THE FOREST RESERVE PROBLEM
 
 9
 We will next discuss the status of the 1,010,000 acres of the Uintah Forest Reserve, which was set aside under the authority of the 1905 Act. The Act provided:
 
 
 10
 That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, ... such portion of the lands within the Uintah Indian Reservation as he considers necessary.
 
 
 11
 * * *
 
 
 12
 33 Stat. at 1070.
 
 
 13
 There is nothing in the 1905 Act or in its legislative history which establishes a "total surrender of tribal interests" or a "widely-held contemporaneous understanding that the affected reservation would shrink," as required by Solem, 104 S.Ct. at 1166. The act merely authorized President Theodore Roosevelt to set apart reservation lands as a forest reserve. This he did. Proclamation of July 14, 1905, 34 Stat. 3113. Indeed the 1905 Act specifically reserved the Utes' timber interests in the lands by authorizing forest officials to sell as much timber as could be safely sold for fifteen years and to pay the money to the Utes. 33 Stat. at 1070.
 
 
 14
 There is clear evidence that Congress did not intend to extinguish the forest lands of the Uintah Reservation. That evidence is shown when the 1905 Act is contrasted with the Act of Apr. 4, 1910, ch. 140, 36 Stat. 269. The latter clearly extinguished a portion of the reservation lands for reclamation purposes. The reclamation lands were originally set aside under the authority of the 1905 Act. This was in the same manner as the forest lands which had been set aside. Yet five years later Congress showed that it could be explicit when it dealt with the reclamation lands. It said: "All right, title and interest of the Indians in the said lands are hereby extinguished, and control thereof shall pass to the owners of the lands irrigated from said project...." 36 Stat. at 285. In contrast, Congress never enacted a subsequent statute extinguishing the Utes' interests in the lands withdrawn for the forest reserve.
 
 
 15
 Also, when Congress compensated the Utes for 973,779 acres of the forest lands in 1931, it recognized the lands as "belonging to such Indians." Act of Feb. 13, 1931, ch. 124, 46 Stat. 1092.
 
 
 16
 Despite the fact that neither the language of the 1905 Act nor its legislative history evidences congressional intent to remove the forest lands from the Uintah Reservation, the district court and this court in its original opinion concluded that the reservation had been diminished because withdrawal of lands for a forest reserve was inconsistent with continued reservation status. 521 F.Supp. at 1138; 716 F.2d at 1314. In reaching this decision, both courts stressed that the administrative authority over the forest lands was transferred from the Department of the Interior to the Department of Agriculture. Such a change in the administration of the lands, however, does not rise to the level of a subsequent event establishing clear congressional purpose to diminish, as required by Solem, 104 S.Ct. at 1166-67.[2]
 
 
 17
 We therefore conclude that the Uintah Reservation was not diminished by the withdrawal of the national forest lands.
 
 III
 THE UNCOMPAHGRE RESERVATION
 
 18
 Following rehearing it became necessary to consider the status of the Uncompahgre Reservation in Utah. This is said to be the least popular of the group. The position which is taken by the district court and by this court in the earlier opinion was that the entire Uncompahgre Reservation had been disestablished. However, there is a lack of evidence of this fact unless there can be disestablishment by failure to develop the area. The State of Utah supports the district court's original decision. Under the Solem standards neither the Uncompahgre Reservation nor the Uintah Reservation has been disestablished or diminished by any of the congressional enactments in question. It must be mentioned, however, that this is, for the most part, a very dry area whose highest value, in addition to agriculture, is its mineral deposits, such as gilsonite, etc. On this account, there is some interest on the part of development parties.
 
 
 19
 It is interesting to note that there exists no clear expression of congressional intent to disestablish the affected areas, including this one, as contemplated by the court in Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).
 
 
 20
 In Solem it was found that it was difficult to disestablish an Indian reservation. It went on to say Congress must "clearly evince" an intent to change boundaries before diminishment will be found. 104 S.Ct. at 1166. The Solem test for determining whether tracts remain a reservation emphasizes this factor. The Solem court also stated that subsequent events such as demographic transformations of the area should be examined and regarded. However, subsequent events should be assessed to a "lesser extent" than the statutory language and surrounding circumstances. Id. at 1167.
 
 
 21
 We now turn to apply these principles to the 1894 and 1897 Acts.
 
 
 22
 In 1894, bills were introduced providing "for opening the Uncompahgre and Uintah Reservations." H.R. 4511, 6557, 53d Cong. 2d Sess. (1894); see S.Rep. No. 450, 53d Cong., 2d Sess., 4027 (1894). It is to be noted that these bills were never enacted. However, the Indian Appropriations Act for 1894 included H.R. 6557, with changes. We first consider the 1894 Act's operative language, set forth below.[3]
 
 
 23
 The 1897 statute which ultimately opened the Uncompahgre Reservation provided:
 
 
 24
 The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Indian Reservation in the State of Utah, said allotments to be upon the Uncomgahgre and Uintah reservations or elsewhere in said State. And all the lands of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes shall, on and after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States; excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances.
 
 
 25
 We mentioned above that there is some interest due to the presence of minerals and it should be mentioned here that the land contains gilsonite and other minerals and unquestionably there is more interest in these features than in limited agricultural activites that have operated in the area.
 
 
 26
 The question as to whether the statutory language of the 1894 and 1897 Acts disestablished the Uncompahgre Reservation calls for an interpretation based on historical research. This court's previous opinion concluded that the statutory language of the 1894 Act established a "baseline" purpose to disestablish which the 1897 Act executed. 716 F.2d at 1306. The opinion read the term "restore to public domain" in the 1894 Act as an indication of a clear congressional intent to remove the Uncompahgre land from the Indians. Our conclusion is that the phrase "restore to the public domain" is not the same as a congressional state of mind to disestablish. In other words, it doesn't disturb the ownership of the land by the tribal group. There are several competing meanings that could be implied from the phrase "restore to the public domain." But the most important one is that it permits the invasion of an area and purchase of land and general utilization. It is said that it is equally plausible that the phrase means that Indian lands would be available for settlement, but that the boundaries remain unchanged. The original expression "return to the public domain" does not reliably establish the clear and unequivocal evidence of Congress' intent to change boundaries. Solem, 104 S.Ct. at 1166.
 
 
 27
 Our reading of the statutory language of the 1894 and 1897 Acts indicates that there is no explicit language of cession, termination, or any other reference to "the present and total surrender of all tribal interests." Id. The provisions of these acts are in sharp contrast to the statutory language in Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) where "termination" was found. See also Mattz v. Arnett, 412 U.S. 481, 504, 93 S.Ct. 2245, 2257, 37 L.Ed.2d 92 (1973). Secondly, we have not found any language which promises the Indians any certain sum for their lands as in Rosebud Sioux Tribe v. Kneip, 430 U.S. at 591, 97 S.Ct. at 1365.
 
 
 28
 As in Solem, 104 S.Ct. at 1169, the references in the 1894 Act to being in "the public domain" and being "open to entry" do not present "an explicit expression of congressional intent to diminish" the Uncompahgre Reservation. We fully agree with this viewpoint.
 
 
 29
 The circumstances surrounding the passage of the Acts also fail to establish a clear congressional purpose to disestablish the Reservation. Our reading of the Act's objectives is that they merely opened lands to public entry and failed to extinguish the Reservation.
 
 
 30
 Our conclusions are first, that the opening of the Uncompahgre Reservation was never formally or informally negotiated between the federal government and the Tribe of Indians. There was never an understanding on the part of the Tribe that they would lose their reservation as a result of the 1897 Act. The Uncompahgres never bargained for the termination of the exterior boundary of their reservation. For example, in Rosebud Sioux Tribe v. Kneip, 430 U.S. at 584, 97 S.Ct. at 1361 and DeCoteau v. District County Court, 420 U.S. 425, 446, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975), the Court found formal negotiation between the tribes and the federal government which resulted in termination. Unlike these earlier cases, the Uncompahgre Indians had no understanding that they were losing their reservation in exchange for a specific benefit.
 
 
 31
 It is true that other evidence as to "surrounding events" is ambiguous. The Cities and Counties cite newspaper articles from the period which refer to the Uncompahgre Reservation as the old or former Reservation. No particular significance can be given to these articles since they were written from the white settlers' points of view. But these statements do not enjoy any official significance. DeCoteau v. District County Court, 420 U.S. at 443, n. 27, 95 S.Ct. at 1092, n. 27.
 
 
 32
 We agree with the Tribe that the restoration of vacant and undisposed lands in 1948 is suggestive of continued reservation status. See Mattz v. Arnett, 412 U.S. 481, 505-06, n. 25, 93 S.Ct. 2245, 2258 n. 25, 37 L.Ed.2d 92. The conclusion to be drawn is that the surrounding events concerning the 1894 and 1897 Acts are ambiguous. They provide no substantial and compelling evidence of a congressional intention to diminish Indian lands. Solem, 104 S.Ct. at 1167. The inconclusive nature of this evidence leads us to the conclusion of Solem: "We are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." Id. (citations omitted). Therefore, we hold that the Uncompahgre Reservation has not been disestablished or diminished.
 
 
 33
 In summary, we conclude that there are no explicit references to boundary changes and disestablishment in the language of the 1894 or 1897 Acts. We also conclude that there is no evidence of a widely-held understanding on the part of the affected Tribe that the Uncompahgre Reservation would be disestablished.
 
 IV.
 CONCLUSION
 
 34
 In closing, we find no evidence, either explicit or implicit, in any congressional enactment that Congress intended to diminish or disestablish the Uncompahgre and Uintah Reservations. We reverse the district court holding insofar as it found the Uncompahgre Reservation disestablished and the Uintah Reservation diminished by the withdrawal of the forest lands. In all other respects we affirm the district court's decision.
 
 
 35
 SEYMOUR, Circuit Judge, with whom HOLLOWAY, Chief Judge, and McKAY and LOGAN, Circuit Judges, join, concurring.
 
 
 36
 I concur in Judge Doyle's opinion holding that Congress did not disestablish either the Uintah Reservation, in whole or in part, or the Uncompahgre Reservation. The views expressed by both Judge Doyle and the district court in Ute Indian Tribe v. State of Utah, 521 F.Supp. 1072 (D.Utah 1981), amply support this conclusion with respect to the Uintah Reservation as a whole. However, the district court held that Congress had extinguished that portion of the Uintah Reservation designated as a forest reserve, and all of the Uncompahgre Reservation. I write separately from Judge Doyle to amplify those points I find critical to his conclusion that the district court erred in this respect.
 
 I.
 UNCOMPAHGRE RESERVATION
 
 37
 The claim that Congress has never disestablished the Uncompahgre Reservation poses a difficult analytical problem. Although both the district court and the panel decided that the reservation had been disestablished, neither court had the advantage of evaluating the issue in light of Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). Solem is particularly helpful in this instance, and a review of its premises will assist our analysis.
 
 
 38
 Solem recognizes that Congress passed a number of surplus land acts at the turn of the century, in response both to pressure for new land and to the prevailing view that Indians should be assimilated into American society through transition to a private agrarian economy. See Solem, 104 S.Ct. at 1164. The land acts were intended to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement.[1] Id. Because each of these land acts was "the product of a unique set of tribal negotiation and legislative compromise," id., each act must be construed independently to determine whether it resulted in actual disestablishment or diminishment of a reservation.
 
 
 39
 This task is complicated by Congress' failure to distinguish between property interest, i.e., or title to the land in question, and reservation status. During the relevant period, ownership of the land and its assets provided the focus of congressional interest. See, e.g., 30 Cong.Rec. 816-40 (1897) (LD 45).[2] "Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries." Solem, 104 S.Ct. at 1165 (citing Act of June 25, 1948, ch. 645, Sec. 1151, 62 Stat. 757 (codified at 18 U.S.C. Sec. 1151) ). Consequently, allotment in severalty to individual Indians and subsequent entry by non-Indians is entirely consistent with continued reservation status. See Mattz v. Arnett, 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).
 
 
 40
 Moreover, at the turn of the century, members of Congress assumed that Indians would eventually be assimilated and the reservation system then dismantled. They were therefore less concerned with the effect of a statute on reservation boundaries than in opening the land to non-Indians. Solem, 104 S.Ct. at 1164-65. This expectation never came to pass, but it contributed to the ambiguity of certain statutory language and the anticipated effect of that language. These considerations are essential in evaluating the Tribe's claim.
 
 
 41
 With this context in mind,[3] Solem directs us to look to the language of the particular act and the circumstances underlying its passage to determine whether Congress clearly evinced an intent to change boundaries. Id. at 1165-66. Appropriately, the most probative evidence of congressional intent is the statutory language used to open Indian lands. Id. at 1166. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." Id. Explicit language of cession is not, however, a prerequisite for a finding of diminishment. When such language is missing, we must determine whether "events surrounding the passage of a surplus land act--particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress--unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation...." Id. (emphasis added).
 
 
 42
 The first surplus land act which pertains to the Uncompahgres was adopted in 1894. See Act of August 15, 1894, ch. 290, 28 Stat. 286, 337-38 (LD 35). The Act provided for allotment of land to the Indians for which they would be required to pay. The Act further provided that unallotted land, i.e., land considered either unsuitable or unnecessary for the Indians' needs, "shall, by proclamation, be restored to the public domain and made subject to entry [under the homestead and mineral laws of the United States]." Id., Sec. 20 at 337. Although the district court and the panel viewed this as language of cession, I believe that Solem dictates a different result. The act at issue in Solem used the term "public domain" in reference to the lands within the purported reservation, as well as the phrase "within the respective reservations thus diminished." Solem, 104 S.Ct. at 1168-69. The Court acknowledged that these isolated references might support a finding of diminishment, but found them "hardly dispositive" when balanced against the "stated and limited goal of opening up reservation lands for sale to non-Indian settlers." Id. at 1169. The Court further noted that there was "considerable doubt as to what Congress meant in using these phrases ... [since] unallotted opened lands could be conceived of as being in the 'public domain' inasmuch as they were available for settlement." Id. at 1169 n. 17 (citations omitted).
 
 
 43
 Ultimately, I interpret Solem to hold that "public domain" language standing alone is insufficient to support a finding of explicit congressional intent to disestablish. In the case before us the ambiguity of the term is only heightened by its subsequent exclusion from the 1897 Act. See Act of June 7, 1897, ch. 3, 30 Stat. 62 (LD 49). Much of the text of the 1894 Act vanished in the 1897 Act, the act that actually succeeded in opening the reservation.[4] The operative phrase which used the term "public domain" was replaced by the following:
 
 
 44
 "[A]ll the lands ... not theretofore allotted in severalty to said Uncompahgre Utes shall ... be open for location and entry under all the land laws of the United States; excepting ... all lands containing gilsonite, asphalt, elaterite, or other like substances."
 
 
 45
 Id. at 87 (emphasis added). The panel and the district court equated this language with the earlier "public domain" language. Prior to Solem, "public domain" language could have been construed as more conclusive evidence of disestablishment; following Solem, the term must be viewed as ambiguous in portent, especially since the change in the 1897 Act reveals Congress' preoccupation with title to the opened lands. As Mattz reminds us, under these surplus land acts, allotment is entirely consistent with continued reservation status. Mattz, 412 U.S. at 497, 93 S.Ct. at 2254. More emphatically, "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." Solem, 104 S.Ct. at 1166. In this light, we cannot read the operative language of the 1897 Act as an explicit indication of congressional intent to disestablish.
 
 
 46
 We must therefore consider whether events surrounding the passage of the Act "unequivocally reveal a widely-held, contemporaneous understanding" that the reservation boundaries would be extinguished. See id. The Supreme Court has found disestablishment in one case where explicit language of cession was missing. In Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), the Rosebud Sioux Tribe voted in favor of an agreement to cede a portion of their reservation in exchange for a sum certain. Congress then passed a series of bills which incorporated the cession language but slightly altered the compensation provision. Although none of the acts clearly severed the Tribe's interest in the unallotted opened lands, the Court held that the statutory language read in conjunction with the agreement by the Tribe unequivocally demonstrated congressional intent to diminish. Id. at 587-88, 97 S.Ct. at 1363-64; see also Solem, 104 S.Ct. at 1165-66 n. 10.
 
 
 47
 We have no such agreement here. In fact, it is clear that the Uncompahgre Tribe vociferously opposed the terms of the 1894 Act, a fact which resulted in the failure of the allotment program. See, e.g., S.Rep. No. 450, 53d Cong., 2d Sess. 1 (1894) ("they have from their long residence upon their present reservation acquired a conviction that the lands belong to them") (LD 27); H.R.Doc. No. 191, 54th Cong., 1st Sess. (1896) (Secretary of Interior response to order asking why the 1894 Act had not been implemented) (LD 39); S.Doc. 32, 55th Cong., 1st Sess. (1897) (relating fact that effort to allot pursuant to 1894 Act ceased in 1896) (LD 46).[5] Therefore, other circumstances must unequivocally reveal an intent to disestablish before we can affirm the judgment of the district court.
 
 
 48
 Legislative reports make clear that Congress perceived no legal obligation to obtain the consent of the Uncompahgres, even though the Supreme Court had not yet decided that Congress could unilaterally disestablish a reservation without Indian consent. See Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). This is so because Congress had been informed that the Uncompahgres were entitled only to temporary occupancy of their reservation until land within the reservation could be allotted in severalty. See, e.g., H.R.Rep. No. 1605, 51st Cong., 1st Sess. 2 (1890); H.R.Rep. No. 660, 53d Cong., 2d Sess. (1894) (LD 30).
 
 
 49
 The roots of this perception are not exactly clear. Before coming to Utah, the Uncompahgres had occupied a reservation in Colorado. In 1880, they were induced to cede their interest in that reservation and agreed
 
 
 50
 "to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah."
 
 
 51
 Act of June 15, 1880, ch. 223, Sec. 1, 21 Stat. 199, 200 (LD 11). The Act authorized the President to appoint a commission to identify eligible Indians and allot to them land in severalty within the prescribed areas. Id., Sec. 2 at 202-203. The Act further directed the Secretary of the Interior to identify "a sufficient quantity of land in the vicinities named ..., to secure the settlement in severalty of said Indians...." Id., Sec. 3 at 203. Once the Secretary had done so, and the allotment process had been completed, the Act contemplated that "all the lands not so allotted, the title to which is [by this agreement] released and conveyed to the United States, shall be held and deemed to be public lands...." Id. Finally, the Act provided that the Indians holding allotments would be subject to the civil and criminal laws of the state or territory in which they resided "with the right to sue and be sued in the courts thereof." Id., Sec. 4 at 204.
 
 
 52
 Had nothing been done between the date of this agreement and the 1897 Act, it is arguable that the Uncompahgres might have had no jurisdictional rights or boundaries. Compare F. Cohen, Handbook of Federal Indian Law, ch. 1, Sec. D3a, at 34-41 (1982) (indicating definition of Indian country under 18 U.S.C. Sec. 1151 (1982) may not include unrestricted allotted land) with id., ch. 9, Sec. A3a, at 499 (reservation may be established without formal executive order if administrative action reveals purpose of inducing a tribe to settle in a designated area and subsequent treatment as a reservation). However, two years later, on January 5, 1882, President Arthur established the Uncompahgre Reservation by an Executive Order. (LD 12). Nothing in the 1880 Act required him to do so; in fact, the Secretary and the Commissioner had been empowered to designate appropriate land for allotment. He may have felt obligated to create the reservation simply because no land was "found" or "available" to the Uncompahgres in Colorado. Instead, the Tribe was forced to settle in a barren region of Utah no one else yet wanted, where there were, at most, 10,000 acres of arable land out of the nearly two million acre reservation. Although the 1880 Act spoke only in terms of title to land, the subsequent Executive Order indisputably created jurisdictional rights for the Uncompahgres. It is well settled that a reservation created by executive order has the identical legal status as one created by Congress. See Mattz, 412 U.S. at 492-94, 93 S.Ct. at 2251-53. Moreover, since title and reservation status are not congruent concepts, the 1882 Executive Order in no way interfered with Congress' intent that the Uncompahgres hold no title to the land.[6] It merely provided a reservation within which, until the allotment process was complete, the Uncompahgres had temporary occupancy of the whole.[7]
 
 
 53
 Following allotment, the lands could be and were opened to public purchase and settlement. Any unallotted land would then be returned to the United States, leaving only individual tribal members with allotments in severalty. See Act of June 15, 1880, Sec. 3 (LD 11). But in my view it is clear that this title arrangement did not undermine the jurisdictional boundaries created by the 1882 Executive Order. The end result was an Indian reservation where the Indians held title to their allotted parcels and the remainder of the land was opened to the public.
 
 
 54
 This analysis is supported by the focus on mineral deposits during congressional debates over the 1897 Act. See Ute Indian Tribe, 521 F.Supp. at 1104; see generally 30 Cong.Rec. 102-08, 712-20, 725, 814-21, 826-33, 1070, 1110-20, 1130, 1208-11, 1245, 1253, 1468 (1897) (LD 45). The reservation was recognized as practically barren and valuable only for its extensive deposits of gilsonite, a mineral previously monopolized by foreign producers. Congress was deeply concerned with providing access to these minerals while preventing monopolization by a few mining interests; hence the provision in both the 1894 and 1897 Acts limiting the number of claims any person could post. Congress was also confused as to the exact nature of the Uncompahgres' interest in the land, as indicated by the remarks of Representative Maguire of California in 1897:
 
 
 55
 "Gentlemen say here that these gilsonite deposits are of no value, but the Government experts report that they are of immense value, and the struggle to secure them through the medium of this amendment shows that they are so regarded by the representatives of private interests. I do not care which statement may be true. If the deposits in question be a great body of valuable public property belonging to the citizens of the United States, we ought not to give them away in the manner proposed. If as the gentlemen from Colorado [Rep. Shafroth] has stated, they have no value, then we ought not to disturb the Indians who are now using the lands in which they lie. They should be permitted to use the land as long as it serves their purposes; certainly until another reservation shall be found for them.
 
 
 56
 It is urged on the one hand that the Indians have title to or at least a vested interest in these lands, and on the other it is denied that they have any such title or interest. Respectable legal opinions have been cited on both sides, showing at least that the question is not free from doubt. Are we, upon ex parte and hasty statements of law and fact, to arbitrarily decide this question against the unrepresented Indians, and drive them ruthlessly from this reservation, without even the suggestion that we will not or hereafter provide them with another?"
 
 
 57
 30 Cong.Rec. at 828-29 (LD 45).
 
 
 58
 These remarks once again reveal Congress' preoccupation with title as well as its general confusion regarding the nature of the Uncompahgres' rights in the reservation. Given such ambiguous circumstances, it is impossible to derive any clear indication of whether Congress intended merely to open the reservation or to disestablish it. Under Solem, we are bound to resolve this ambiguity in favor of the Tribe. Judge Jenkins, in his thoughtful opinion, correctly pointed out the lack of congressional statements indicating that the Uncompahgre Reservation was intended to survive the opening, 521 F.Supp. at 1107, but he applied the wrong test in inferring disestablishment from this fact. Explicit congressional intent to alter reservation boundaries must be affirmatively shown.
 
 
 59
 "When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening."
 
 
 60
 Solem, 104 S.Ct. at 1167 (emphasis added).
 
 
 61
 Undeniably, Congress could be explicit when it chose to be. See Mattz, 412 U.S. at 504-05 & n. 22, 93 S.Ct. at 2257-58 & n. 22. Congress was completely clear when it terminated Uintah rights in the Gilsonite Strip, see Act of May 24, 1888, ch. 310, Sec. 1, 25 Stat. 157 (LD 18), and the Strawberry Reservoir Project lands, see Act of April 4, 1910, ch. 140, Sec. 23, 36 Stat. 269, 285 (LD 139); see also Act of June 15, 1880, Sec. 1, 21 Stat. 199, 200 (LD 11) (ceding the Ute Colorado lands to the United States). However, no explicit language of cession can be found in either the 1894 or 1897 Acts or in their legislative history. Moreover, surrounding circumstances do not indicate a widely-held contemporaneous understanding that the reservation boundaries would disappear, as opposed to a transfer of the title to the lands. I believe that this is so because Congress truly was not concerned about the implications for the Indians of continued reservation status, because it anticipated the future demise of the reservation system and envisioned no influx of white settlers to that barren region. See Solem, 104 S.Ct. at 1164-65. Instead, Congress was concerned solely with title and access to the unique mineral deposits found there.
 
 
 62
 In addition, the subsequent history of the region does not compel a finding of disestablishment. Few people, Indian or non-Indian, live there today. The character of the area has not changed to such an extent that the reservation has de facto disappeared. See id. at 1167. Finally, although Solem accords subsequent treatment of the area by the federal government and local authorities "some evidentiary value," id., these later events are not dispositive of congressional intent at the time of opening. Had such events resulted in a dramatic change in the character of a region, they would weigh more heavily. However, the one event that seems irreconcilable with continued reservation status, the 1948 Hill Creek Extension, see Act of March 11, 1948, ch. 108, 62 Stat. 72 (LD 187), in no way changed the character of the region. In fact, it preserved its Indian character. Absent such a change, Congress' action fifty years following the opening of the reservation does not alter my previous conclusion.
 
 
 63
 Accordingly, given the ambiguity of the statutes, congressional confusion concerning the nature of Indian rights within the reservation and how the legislation would affect those rights, the lack of an agreement with the Uncompahgres concerning cession of their interests, and the lack of change in the character of the land, I believe that Congress never clearly evinced an intention to disestablish the Uncompahgre Reservation boundaries and that the evidence supporting such a conclusion is neither substantial nor compelling.
 
 II.
 THE FOREST RESERVE
 
 64
 These same principles support the conclusion that the forest reserve remains within the boundaries of the Uintah Reservation. The 1905 Act provides as follows:
 
 
 65
 "That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules and regulations governing forest reserves, ... such portion of the lands within the Uintah Indian Reservation as he considers necessary."
 
 
 66
 Act of March 3, 1905, ch. 1479, 33 Stat. 1048, 1070 (LD 105). Assuming the Uintah Reservation was never disestablished, nothing in this paragraph amounts to explicit language of cession or a total surrender of Indian interests. The Act merely contemplated the opening of the reservation to non-Indians and permitted the United States to reserve those lands it wished to withhold from settlement.
 
 
 67
 I find nothing in this action inconsistent with continued tribal jurisdiction within the forest reserve, even though the laws governing national forests are comprehensive. In 1897, when Congress set forth some of the details of its policy for management of National Forests, see 30 Stat. 34-36, it left room for the limited exercise of jurisdiction by the state in which the forest is located. See 30 Stat. 36 (1897) (codified at 16 U.S.C. Sec. 480).[8] Thus it is clear that the goals of the national forest system as of 1905, including protection of the watershed, protection of fish and game, and management of timber resources, see, e.g., 30 Stat. 35 (1897); 33 Stat. 872-73 (1905), could be achieved without taking jurisdiction away from Indian Tribes. Consistent with this analysis, the United States has supported the Tribe's claim to the forest reserve throughout this litigation.
 
 
 68
 This tribal jurisdiction is limited by federal resource management policy. The U.S. Forest Service and other federal agencies such as the U.S. Fish and Wildlife Service participate in managing the land and resources of a national forest. Because these agencies are arms of the United States entitled to sovereign immunity from the Tribe's dictates, the Tribe has no more authority to interfere with federal management of the Uintah forest reserve as a national forest than would the State of Utah. Federal agencies may choose to incorporate tribal or state laws for fishing, hunting, or the like, or they may preempt these laws by promulgating regulations designed to further federal land management policy.
 
 
 69
 As a practical matter, therefore, Indian tribal jurisdiction over the forest reserve will permit the Tribe to govern its members, but will not greatly affect non-Indians. National forest land that is on an Indian reservation is similar to land that is privately held within a reservation; it is not "land belonging to the Tribe or held by the United States in trust for the Tribe." Montana v. United States, 450 U.S. 544, 557, 101 S.Ct. 1245, 1254, 67 L.Ed. 2 (1981). The Tribe's power to exercise civil authority over non-Indians on such land covers only conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566, 101 S.Ct. at 1258.
 
 
 70
 As Judge Doyle points out, Congress sought to protect Indian interests in the forest lands so reserved and managed. The 1905 Act authorized forest officials to sell as much timber as could be safely harvested and to pay the money to the Utes for fifteen years. The provision only indicates Congress' assumption that the reservation system would be dismantled in the near future. Since we have construed the 1905 Act to open rather than disestablish the Uintah Reservation, this provision does not indicate a present congressional intent to terminate Uintah interests in the forest reserve; indeed, it preserves them. Moreover, Congress recognized that this provision was insufficient to terminate all Indian rights in the land. This fact is indicated by comparing Congress' treatment of a reservoir site in the same Act. The Act authorized the President to "set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development." 33 Stat. 1070. The President did so on August 3, 1905. However, Indian rights were actually terminated only when Congress passed a second statute providing that "[a]ll right, title, and interest of the Indians in the said lands are hereby extinguished...." Act of April 4, 1910, ch. 140, Sec. 23, 36 Stat. 269, 285 (creating the Strawberry Reservoir Project) (LD 139). In contrast, Congress never specifically terminated Indian interest in the forest reserve lands.
 
 
 71
 In finding diminishment, the district court expressed concern that the presidential proclamation reserving the forest lands, see Proclamation of July 14, 1905, 34 Stat. 3116 (LD 107), was made pursuant to a general act authorizing the President to set apart "public land bearing forests ... as public reservations. " Act of March 3, 1891, ch. 561, Sec. 24, 26 Stat. 1095, 1103 (LD 25) (emphasis added). In light of the earlier discussion of the implications of public domain language under Solem, I cannot see that this language alters my analysis. Congress was opening the reservation to public entry, and the United States was exercising its right to choose first from available land. The United States eventually paid for most of the land it had reserved, see Act of February 13, 1931, ch. 124, 46 Stat. 1092 (LD 167), and returned the remaining portion to Ute ownership, see Act of July 14, 1956, ch. 603, 70 Stat. 546 (LD 203). Since, as established above, such an exchange of title cannot affect reservation status, the term "public reservation" does not require us to conclude that Congress withdrew the forest reserve from the Uintah Reservation.
 
 
 72
 Nor does the fact that Congress once created a specifically Indian forest reserve compel such a conclusion. In that instance, Congress deferred to Indian management of the forest lands. Here Congress intended the lands to be federally managed as part of the existing Uintah Forest Reserve. As noted above, in light of 16 U.S.C. Sec. 480, I see no conflict between federal management of forest land and continued reservation status.
 
 
 73
 Finally, I am not persuaded by the panel's reliance on United States v. Gemmill, 535 F.2d 1145 (9th Cir.), cert. denied, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), and United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 206 Ct.Cl. 649 (1975). In those cases, creation of a forest reserve was only one of several factors indicating the unambiguous extinguishment of Indian rights.
 
 
 74
 In sum, I would affirm the district court insofar as it holds that the Uintah Reservation was not disestablished. I would reverse the district court insofar as it holds that the portion of the Uintah Reservation reserved as a forest and the Uncompahgre Reservation were disestablished.
 
 
 75
 SETH, Circuit Judge, dissenting.
 
 
 76
 I must respectfully dissent.
 
 
 77
 These appeals concern the continued existence of the Uncompahgre and Uintah Indian reservations. The Ute Tribe in Utah fashioned a Law and Order Code which purported to exercise jurisdiction over all the lands within the original Uintah reservation created by executive order in 1861 as well as the Uncompahgre Indian reservation created in 1882, both in Utah. The State of Utah and several Utah counties and cities questioned tribal jurisdiction over much of this land arguing that a great deal of the Uintah reservation and the whole of the Uncompahgre reservation had been disestablished and was no longer "Indian Country." (18 U.S.C. Sec. 1151.)
 
 
 78
 This Ute Tribe (the Uintah, White River and Uncompahgre bands) brought suit for declaratory judgment and injunctive relief, requesting that the present extent of the reservations and of tribal jurisdiction be determined. The trial court heard extensive testimony and performed an exhaustive study of legislative and administrative materials relating to the history of both the Uintah and Uncompahgre reservations. The transcript and the record comprise several thousand pages.
 
 
 79
 As to the Uintah reservation the trial court decided that the original reservation had been changed by several Acts of Congress directed to particular tracts. Thus Congress had removed a 7,040-acre tract known as the Gilsonite Strip in 1888, had removed 1,010,000 acres of land for National Forest purposes in 1905, and had also withdrawn 56,000 acres of land for a reclamation project in 1910. In 1948 the Uintah reservation was increased by 510,000 acres by the addition of the Hill Creek Extension. Except for these specific Acts of Congress, the trial court held that all lands within the original boundaries of the Uintah reservation remained "Indian Country." The individual allotments to Indians, the public law entries by others and some mineral locations were recognized. These were, however, within the exterior boundaries of the reservation.
 
 
 80
 The trial court concluded that the Uncompahgre reservation had been disestablished.
 
 
 81
 The resolution of a dispute such as this involving Indian reservations turns on what Congress intended to accomplish at the time as a legal matter. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); see Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). The conclusions of the trial court on this point are persuasive, but are not considered to be findings of fact.
 
 
 82
 The method of examining legislative history and determining legislative intent in cases concerning Indian reservations has been addressed by the United States Supreme Court in recent times. Four such cases are especially significant to our problem. Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), was decided in 1962 and concerned the Colville Indian reservation. The Court held that the North half of the reservation had been disestablished, but the South half remained in reservation status. The Act of Congress said to have disestablished the North half declared that it should be "vacated and restored to the public domain." 27 Stat. 62, 63. The relevant acts with regard to the South half of the reservation allotted the land pursuant to the Congressional policy expressed in the General Allotment Act of 1887, 24 Stat. 390, but did not contain language of vacation and restoration or the term "public domain." Seymour, at 355, 82 S.Ct. at 427. The Court also mentioned subsequent legislative and administrative history of the South half of the reservation to support its conclusion that it was still a reservation. On these grounds the Court held that the South half of the reservation retained its status as Indian Country.
 
 
 83
 In Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), decided in 1973, the Court held that the Klamath River reservation had not been disestablished. The Court made it clear that the allotment of lands within the reservation to resident Indians was consistent with reservation status and an opening for settlement in addition did not disestablish. Thus a more explicit indication of Congressional intent was necessary to disestablish. However, the Court did not rest its decision on the fact that the unequivocal language of vacation and restoration to the public domain that had been present in Seymour was absent in Mattz. Clearly the Court was unwilling to suggest that there were any special recitations the absence of which would mean that a reservation continued. In addition to considering the historical background of the reservation and the legislative history, the Court observed that several bills which contained clear language of disestablishment passed the House of Representatives but did not pass in the Senate. The Court interpreted the repeated failure of those bills as a sign of Congressional intent that the reservation continue. Thus the crucial point was not simply that the final Allotment Act for the Klamath River reservation lacked language of disestablishment, but that Congress had never at any stage permitted such language to be passed into law. It is important that in Mattz the Court stated that an opening of a reservation for settlement did not necessarily disestablish the reservation. This was referred to in the Rosebud opinion hereinafter considered. The settlement by Indians and non-Indians was considered to be of benefit to the Indians.
 
 
 84
 The Court in Mattz discussed the subsequent jurisdictional history of the reservation as an illustration for its holding of continued reservation status rather than as a foundation for that holding. No detailed analysis of legislative intent was undertaken at the time of the Acts said to constitute disestablishment for any of these cases.
 
 
 85
 DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), raised the question of whether the Lake Traverse Indian reservation survived a restoration to the public domain. The Court held that it did not, based also on the express Indian cession of the land. This feature of the DeCoteau case has no application to the case at bar but DeCoteau is important as to the significance of the phrase "public domain." The Court, in comparing the legislation there in question to other Indian agreements, stated, at 446, 95 S.Ct. at 1094:
 
 
 86
 "That the lands ceded in the other agreements were returned to the public domain, stripped of reservation status, can hardly be questioned, and every party here acknowledges as much. The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.' "
 
 
 87
 The Court speaks as if a restoration to the public domain settled the matter of disestablishment. The position of the two phrases suggests that "returned to the public domain" is synonymous with "stripped of reservation status." With regard to the question of jurisdictional history, the fact that the State of South Dakota had exercised virtually undisputed jurisdiction over the land was important to the Court's decision.
 
 
 88
 Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), is of overriding importance to the determination of the case before us because it is the most recent Supreme Court case on the subject and because it provides a detailed analysis. The facts of Rosebud are similar to those of other disestablishment cases. The language on which the Court relies in finding disestablishment of the reservation in Rosebud does not contain a phrase analogous or similar to "vacated and restored to the public domain" of Seymour. Rosebud involved unilateral action by Congress rather than cession by the Indians. Rosebud lays out what the Court terms some "well-established legal principles." One of these is the general rule that doubtful expressions are to be resolved in favor of the Indians. The Court cautions that the resolution of doubt in favor of the Indians is not to be done by ignoring clear indications of Congressional intent, nor does this method of resolving doubt intrude on the Court's holding in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903).
 
 
 89
 The Supreme Court in Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), considered the Cheyenne River Act of May 29, 1908. The Act authorized the Secretary to sell portions of the reservation within a described area with the proceeds to go to the benefit of the Indians. The opinion considers the older cases herein referred to but only decided the consequences of the Act authorizing sales. It does not provide direction as to our problem.
 
 
 90
 In Lone Wolf the Court held that Congress possessed the authority to abrogate unilaterally the provisions of an Indian treaty. This eliminated the notion that Congressional action with regard to an Indian reservation involved some sort of implied contract. After Lone Wolf in 1903 established that Congress could act unilaterally toward Indian lands and reservations, the only relevant inquiry became Congressional intent. This prevailed in Rosebud where the Congressional action under discussion was the ratification of an agreement with the Indians. It is significant to our problem that the Court in Rosebud held that a beneficial interest retained in the lands opened does not preserve to the reservation its original size and shape.
 
 
 91
 The guiding consideration in Rosebud is, of course, the determination of Congressional intent. The Court said of this in Rosebud:
 
 
 92
 "In all cases, 'the face of the Act,' the 'surrounding circumstances,' and the 'legislative history,' are to be examined with an eye toward determining what congressional intent was."
 
 
 93
 Before turning to the application of these considerations, it is important to note one feature of the Rosebud analysis. In Mattz v. Arnett, as discussed above, the Court rejected the contention that bills passed in one House of Congress but not the other, could be an indicator of Congressional intent. Rosebud gives a contrary signal as Congress had failed to ratify a 1901 agreement which would have disestablished the reservation but ratified a similar agreement in 1904. The Court observed that the 1901 agreement would unquestionably have changed the reservation boundaries had it been ratified. The 1904 ratification the Court stated evinced a continuity of purpose and language with the 1901 attempt. Therefore, the 1901 agreement even though not ratified demonstrated "an unmistakable baseline purpose of disestablishment." Rosebud, 430 U.S. at 592, 97 S.Ct. at 1366. This line of reasoning modifies Mattz in explaining techniques of determining Congressional intent. Under Rosebud, if the language of an earlier bill is sufficiently unequivocal, and a later Act can be shown to have accomplished the intended purpose of the first, then the first gains validity as an indicator of Congressional intent even though it did not pass both Houses. This analysis has important application in the case at bar.
 
 
 94
 In Rosebud, as in DeCoteau, the assumption of state jurisdiction for many years before the suit arose was fairly clear. All the same, the Court does not rely heavily on that history, but mentions it only after having arrived at a conclusion of disestablishment on the basis of legislative history and statutory construction.
 
 
 95
 It is clear from the above cases that the controlling factors are, of course, terms of the Act with legislative intent, but we are cautioned against relying on particular statutory language. However, a phrase such as "vacated and restored to the public domain" seems to be a sufficient though not a necessary factor in disestablishment. Compare DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), with Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). DeCoteau implies that language restoring the reservation to the "public domain" may be enough to constitute disestablishment. The subsequent legislative and administrative history is sometimes used to support an interpretation of an Act. Finally, considerations of jurisdictional history and contemporary opinion on reservation status seem to be relied upon only where they are unequivocal. More often, they are discussed to demonstrate that they are not necessarily contrary to the conclusion already reached on the basis of statutory language and history.
 
 
 96
 In determining legislative intent it is necessary to consider the legislation in its historical context and not as if it were passed today. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Mattz refers to the "surrounding circumstances." Thus a study of the purpose of any legislation involving the Indians would be incomplete and inaccurate without a consideration of the then prevailing policy on the subject. It is apparent that such policy does not follow an unwavering line, and may not appear in a very obvious way. However, in the case before us there was a very clear and drastic policy change which was put into operation throughout the West in all the larger Indian reservations. This was the General Allotment Act of 1887, 24 Stat. 390. This expressed the policy of replacing the reservations with allotments of a tract of land to each Indian to be owned individually. This was known as the Dawes Act and was introduced by Senator Dawes of Massachusetts. He had been active in groups seeking to improve the life of the Indians.
 
 
 97
 The Secretary of Interior commented when it was pending as a bill and said in part that it would:
 
 
 98
 "inspire the Indians with a feeling of assurance as to the permanency of their ownership of the lands they occupy and cultivate; it will give them a clear and legal standing as landed proprietors in the courts of law; it will secure to them for the first time fixed homes under the protection of the same law under which white men hold theirs; it will eventually open to settlement by white men the large tracts of land now belonging to the reservations but not used by the Indians. It will thus put the relations between the Indians and their white neighbors in the Western country upon a new basis, by gradually doing away with the system of large reservations, which has so frequently provoked those encroachments which in the past have led to so much cruel injustice and so many disastrous collisions."
 
 
 99
 Report of the Secretary of the Interior, 1880, in serial 1959, pp. 5-6, 12.
 
 
 100
 Senator Dawes understood the Act to have as its goal the abolition of the reservation system. In addressing the Fifth Annual Meeting of the Lake Mohawk Conference of the Friends of the Indian, Senator Dawes stated:
 
 
 101
 "Suppose these Indians become citizens of the United States with this 160 acres of land to their sole use, what becomes of the Indian Reservations, what becomes of the Indian Bureau, what becomes of all this machinery, what becomes of the six commissioners appointed for life? Their occupation is gone; they have all vanished, the work for which they have been created ... is all gone.... You are not mending this fabric; you are taking it down stone by stone...."
 
 
 102
 Minutes of the Lake Mohawk Conference, 1887, pp. 12-13.
 
 
 103
 Thus in the period between 1897 and 1905 when legislation opening the Uncompahgre and Uintah reservations was passed, the policy embodied by the Dawes Act was in full force and being implemented. "Friends of the Indians" wished to abolish the reservations out of a genuine conviction that such an abolition would contribute to the Indians' welfare. Concurrently with Senator Dawes but separately there were present in a myriad of forms the forces of expansion always seeking the development of the West and especially seeking more land in the West. These forces were likewise effective in Congress at the time here concerned.
 
 
 104
 We cannot be here influenced by what Congress might have done. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). We must instead decide what Congress in fact did. "[O]ur task here is a narrow one.... [W]e cannot remake history." DeCoteau v. District County Court, 420 U.S. 425, at 449, 95 S.Ct. 1082, at 1095, 43 L.Ed.2d 300 (1975).
 
 
 105
 The Utes argue that the original Uintah and Uncompahgre reservations exist to their original extent except as to a few relatively small tracts. The two reservations when created contained some 4,000,000 acres. In 1905, when Congress was considering legislation concerning the reservations, there were about 1,440 Utes in the three bands. There are now about 1,500 enrolled members of the tribe. Nearly all of these live on the trust lands (that is on allotments and tracts reserved for tribal use). Federal programs and services appear to be available to all regardless of the outcome of this case.
 
 
 106
 Under the decision of the trial court the non-Indian towns of Duchesne and Roosevelt are within what were considered to be the reservation boundaries. About 90 percent of the population of a reservation so constituted would live in these towns. Most of the lands opened for settlement are in Duchesne County. About 300 Indians live there, but all are not members of the tribe. No one challenges the Indians' claim to the tracts for grazing set apart for the Indians and, of course, to the allotments made to individual Indians (about 360,000 acres) nor to the lands restored in the 1940's to the Indians (some 217,000 acres) nor to the Hill Creek Extension of about 500,000 acres. The basic dispute is to the non-Indian owned portions of the original reservations, and the National Forest portion.
 
 
 107
 Before the present dispute the trust land, the reserves and the allotments were referred to as the "Ute reservation" or the "Uintah reservation," and this explains the occasional use of the terms when additions were made extending the reservation or extending the reservation boundaries.
 
 I. THE UNCOMPAHGRE RESERVATION
 
 108
 The Uncompahgre reservation when established contained about 3,000 square miles and was apparently never occupied by more than several hundred Utes at any time. Most of them by 1905 had moved to the Uintah reservation, and they had taken allotments on that reservation rather than on the Uncompahgre.
 
 
 109
 In determining the status of the Uncompahgre reservation I am chiefly concerned with two pieces of legislation. The first is part of the Indian Appropriations Act of 1894, which contains this language:
 
 
 110
 "Sec. 20. That the President of the United States is hereby authorized and directed to appoint a commission of three persons to allot in severalty to the Uncompahgre Indians within their reservation, in the territory of Utah, agricultural and grazing lands.... Said commissioners shall ... report to the Secretary of the Interior what portions of said reservation are unsuited or will not be required for allotments, and thereupon such portions so reported shall, by proclamation, be restored to the public domain and made subject to entry as hereinafter provided.
 
 
 111
 ....
 
 
 112
 "Sec. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, and if possible, procure the consent of such Indians to such relinquishment, and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress."
 
 
 113
 Act of August 15, 1894, ch. 20, 28 Stat. 286, 337-338.
 
 
 114
 This Act directs the Secretary to immediately open the unallotted lands, after approval of the allotments to entry. The land reported as unsuitable shall "thereupon" be restored to public domain by proclamation. The use of the then universally recognized term "public domain" in designating the eventual status of the land is of critical importance. The status of "public domain" there demonstrates an intent to disestablish. See DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Land to be in the "public domain" is inconsistent with reservation status or any particular use status. When public land is designated to be used for a particular purpose the land no longer remains in the "public domain." Scott v. Carew, 196 U.S. 100, 25 S.Ct. 193, 49 L.Ed. 403 (1905); Wilcox v. Jackson, 13 Pet. 498, 10 L.Ed. 264 (1839). Thus the creation of an Indian reservation or a forest or other particular use from public land removes it from the public domain. Missouri, Kansas and Texas Ry. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377 (1894); Leavenworth, Lawrence and Galveston Railroad Co. v. United States, 92 U.S. 733, 2 Otto 733, 23 L.Ed. 634 (1875). The "public domain" is a well-recognized description of the status of the land. It was probably more generally recognized at the time the acts in issue were passed than it is now. It is clear that the creation of an Indian reservation from "public lands" removes the subject lands from the public domain. The return of particular use lands to the public domain involves similar land status concepts, and "public domain" then must have the same meaning as it did before. In DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), the Court held that public domain status and reservation status are mutually exclusive.
 
 
 115
 Another feature of the 1894 Act is the presence of limitations on "entry" when the land is opened. The tribe argues with respect to the Uintah reservation that limitations on entry demonstrate that Congress did not intend full public domain status for the land. The opening of the Uncompahgre reservation disproves this theory both in the 1894 Act and in the legislative history of that Act. On the face of the 1894 Act the term "public domain" appears simultaneously with provisions limiting entry. Clearly, Congress did not consider these two things to be inconsistent. The legislative history shows that the purpose of the limitation to homestead and townsite entry was not to permit the Indians to retain control of the land, but was to prevent land speculation. Congress gave a great deal of time and care to trying to prevent the land from being snapped up by speculators. 53 Cong.Rec. 7684 (1894); 53 Cong.Rec. 7258-59 (1894). At no time during these debates was there any discussion to suggest a continuing claim by the Indians. Rather the House debated whether the Indians would be required to pay for their allotted lands, implying that Indian title to the reservation was not secure even in 1894 without some payment. 53 Cong.Rec. 7258 (1894). The proper analysis is that once land has been again placed in the public domain it is open and free to the application of the public land laws. Congress may then make limitations on entry and location, but these do not change the status of the land.
 
 
 116
 A final note about the 1894 Act is that it provides that the commission appointed to allot to the Uncompahgres should also attempt to procure the agreement of the Uintah Indians to the relinquishment of their land. Thus as early as 1894, Congress contemplated the allotment and opening of the Uintah reservation. It is difficult to escape the impression that Congress hoped and sought to have allotments made to all the Indians as individuals, and to open the land in the reservations not so allotted under the public land laws.
 
 
 117
 Thus the 1894 Act, although it did not accomplish the opening of the reservation, persuasively indicates by the use of the term "public domain" that it was Congress' intent to remove this land from the Indian reservation. The power of this phrase is not weakened by any limitations on methods of entry to the land. I therefore conclude that this piece of legislation may be sufficient to demonstrate a "baseline" purpose to disestablish that later legislation carried through. The commission appointed by the 1894 Act failed in its efforts to make allotments to the Uncompahgres and was disbanded in 1896.
 
 
 118
 In 1897, Congress enacted a provision which made the allotment and opening of the Uncompahgre reservation mandatory. Thus:
 
 
 119
 "The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompagre Ute Indian Reservation in the State of Utah, said allotments to be upon the Uncompahgre and Uintah Reservation or elsewhere in said State. And all the lands of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes shall, on or after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States, excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances."
 
 
 120
 Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.
 
 
 121
 The analogy to Rosebud which I have pursued here is not exact. The 1894 Act was in fact passed by both Houses of Congress, but its execution was not accomplished as we have seen. As an instrument of disestablishment it did not itself mandate the actual opening of the reservation, but the lands were to be restored to the public domain. When the lands became public domain they thereby were available under the public land laws to entry and location in the usual manner for all public lands. The "opening" and details for making entries were included in other acts to provide some organization to the expected rush to make entries. Thus the drawings here and at Rosebud were provided much like the simultaneous filings of today. Several hundred thousand people appeared for the Sioux drawings.
 
 
 122
 As the trial court observed, legislative and administrative history supports the conclusion that the Uncompahgre reservation was disestablished. The commission attempted to make allotments after the opening date of the 1897 Act as if the land was on a reservation. The Commissioner of Indian Affairs was unsure of the legality of this, as the lands were now in the "public domain." Rept. of the Comm. of Ind.Aff., 1898, JX 108, in H.Doc. No. 5, 55th Cong. 3d Sess. In the next few years, there were concerns that even these allotments might fail, and the Indian agent suggested that these Indians abandon the lands for lands on the Uintah reservation. See Letter from Acting Agent Mercer to Comm. of Ind.Aff. of Sept. 9, 1903, JX 174; Letter from Agency Clerk to the Agent of Aug. 31, 1903, JX 173; Letter from the Comm. of Ind.Aff. to Acting Agent Mercer of July 28, 1903, JX 170. Finally, by 1929, the Bureau of Indian Affairs seems clearly to have taken the position that the Uncompahgre reservation no longer existed. See Statement Concerning the Uncompahgre Grazing Reserve, Feb. 6, 1943, JX 451; Memorandum Relating to the Proposed Withdrawal of Certain Lands for Uncompahgre Ute Indians, Office of Indian Affairs, 1931, JX 426.
 
 
 123
 A final point illustrates both that "public domain" language was intended to apply through the 1897 Act to the Uncompahgres and that Congress, at least to some extent, considered the Uncompahgres and the Uintahs together when making law concerning the Indian reservation in Southern Utah. In the 1897 Act, it is expressly provided that the Uncompahgres may be given allotments on Uintah land. In 1902, in dealing with the Uintah reservation Congress again explicitly provided that the Uncompahgres be given allotments on Uintah land. 32 Stat. 245. This 1902 Uintah Act also contained "public domain" language. I do not rely on these connections, but they do provide some indicators of Congressional actions and intentions with regard to the Ute Tribe.
 
 
 124
 I understand Congress to have intended, and did disestablish the Uncompahgre reservation as concluded by the trial court.
 
 II. THE UINTAH RESERVATION
 
 125
 An Indian reservation was established by President Lincoln in 1861 to encompass the entire valley of the Uintah River within the Utah Territory. This was at the time the Government was attempting to have the Utes of Colorado and New Mexico and others settle in designated areas. The reservation was thus for any Indian. Congress confirmed the reservation in 1864 (13 Stat. 63). This in part said:
 
 
 126
 "Sec. 2. And be it further enacted, That the superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uinta valley, in said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same." (Emphasis in original.)
 
 
 127
 The reservation contained about 3,186 square miles or 2,039,040 acres, and may have been established for many more Indians than those who "were induced to inhabit the same."
 
 
 128
 In the half century following the establishment of the reservation Congress enacted several laws which the counties and cities claim altered substantially the status of the lands initially encompassed within it. The Utes claim the entire reservation as initially created save for two small diminishments, and claim that the legislation did not affect their rights. The counties and cities claim that the legislation enacted between 1888 and 1905 diminished the original reservation by withdrawing acreage on several occasions: to enable mining in the area known as the Gilsonite Strip; to enlarge the Uintah National Forest; and to create an irrigation project along the Strawberry River. The counties and cities also claim that the Acts of Congress in 1902 and in 1905 directed that allotments of lands in the reservation be made to individual Indians and provided that all lands not allotted were restored to the public domain, and thereby were no longer a part of the reservation.
 
 The Gilsonite Strip Withdrawal
 
 129
 The first of the Acts of Congress was directed to a 7,000-acre tract in the reservation. In 1886 a prospector had located mining claims on the Uintah reservation for the mineral gilsonite. The land in question was not then being used by the Indians for agricultural or grazing purposes. Congress in 1888 passed an Act which mandated that the 7,040-acre "Gilsonite Strip" be "declared to be public lands of the United States and restored to the public domain." Act of May 24, 1888, ch. 310, 25 Stat. 157. The Act directed the Secretary of the Interior to procure the approval of a three-fourths majority of the adult male Indians, and to sell the land. Approval was secured and some sales made. The proceeds were credited to the Utes. The trial court found, and the parties do not dispute on appeal, that the Gilsonite Strip was removed from the reservation. I agree with this conclusion. The 1888 Act contained a significant restriction on the manner of entry after the lands were restored to the public domain. Thus the lands were to be sold in lots not exceeding one-quarter section in size. The parties do not dispute that this limitation on the manner of the disposition did not affect its removal from the reservation and restored it to the "public domain."
 
 Unallotted Lands
 
 130
 During the 1890's and thereafter there was increasing pressure on Congress and the President to open parts of most of the large Indian reservations in the West to settlement by non-Indians, and also to have the Indians own individualy tracts of land for their own betterment. I have mentioned these two movements in this opinion. The literature of the time and the court opinions refer to these as the "familiar forces."
 
 
 131
 The familiar forces thus sought to remove parts of the Uintah Valley reservation from reservation status and so to permit individual ownership by the Indians and to open it for settlement and mining. Thus in this context, with the recognized policy evidenced by the General Allotment Act, and the opening of other reservations, the Uintah Valley reservation was not an isolated instance where the "familiar forces" brought about changes. The people seeking the changes as a betterment for the Indians were sincere in their views. Many public figures advocated individual ownership by Indians, as indeed did a majority in the Congress and the President. The General Allotment Act must be taken as one example and is a clear and definite expression of the policy. Directions to carry it out were included in many pieces of legislation. This was the dominant feeling and policy of the time, the time when the legislation herein considered was passed. Its intent and purpose must be determined in that context, and not as the policies may now exist. Thus Congress in 1888 (25 Stat. 157) declared that a described portion of the Uintah Valley reservation "is hereby declared to be public lands of the United States and restored to the public domain." The Act provided that the restoration be effective upon ratification by three-fourths of the Indians on the reservation. This ratification was not obtained.
 
 
 132
 Congress also had commissions appointed to negotiate allotments and cessions of the Uncompahgre and Uintah reservation in 1894, 1897 and 1898.
 
 
 133
 Then on May 27, 1902 Congress included as part of the Indian appropriations bill a direction that allotments be made to all adult White River and Uintah Utes. This included a provision restoring any unallotted lands of the 1864 Uintah reservation to the "public domain." Act of May 27, 1902, 32 Stat. 245, 263. The provision, in pertinent part, is as follows:
 
 
 134
 "That the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain."
 
 
 135
 The term "public domain" was used twice more in the later portions of the Act. This was one of several connected acts about which this dispute is centered and the references to "public domain" status for the lands not allotted to individual Indians are very significant to the arguments of the parties and to the position taken by the trial court. Congress thereafter used appropriation acts in 1903, 1904 and 1905 to extend the time for opening and to insert added provisions. This was a series of acts with no express words of amendment and with express repeal of relatively small elements in the prior acts.
 
 
 136
 The trial court reasoned that the Supreme Court's holding in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), compelled a finding that the language of the 1902 Act providing that all of the unallotted lands "shall be restored to the public domain" would have disestablished the reservation had the unallotted lands then been opened for settlement. The trial court reasoned, however, that this 1902 Act was so changed by a 1905 enactment that such a result did not come about.
 
 
 137
 The Utes attempt to distinguish Seymour by arguing that this 1902 Act may restore the unallotted lands to the public domain, but there is also needed a provision that the lands be vacated by the tribe before the lands are restored to the public domain. They argue that the cases uniformly provide that independent language to indicate that the reservation boundaries would be extinguished or adjusted at the same time that public entry was allowed is necessary to disestablish. They cite DeCoteau v. District County Court, 420 U.S. 425, 445-46, 95 S.Ct. 1082, 1093-94, 43 L.Ed.2d 300 (1975) (the express language of cession and relinquishment of reservation lands restored them to the public domain); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (Act of March 2, 1889, Sec. 21, 25 Stat. 896, created six separate reservations from the Great Sioux reservation and "all the lands in the Great Sioux Reservation outside of the separate reservations herein described are hereby restored to the public domain," 25 Stat. at 896); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) ("vacated and restored to the public domain"); Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (1913) (Secretary of the Interior to cause the quantity of land allowed Indians remaining on the reservation to be selected in as compact a form as possible, the remainder to be restored to the public domain, Act of July 4, 1884, 23 Stat. 76); Russ v. Wilkins, 624 F.2d 914 (9th Cir.1980) (explicit description of new reservation boundaries, the remainder "restored to the public lands of the United States," 17 Stat. at 634). These cited cases, as indicated by the notes, are however a mixture of statutory provisions, and do not stand for a proposition that a provision vacating the reservation or describing new boundaries is required for disestablishment.
 
 
 138
 The argument that the operative language of restoration must contain independent language adjusting or extinguishing reservation boundaries is unpersuasive. The Supreme Court has never mentioned such a requirement, see, e.g., Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), and I see no reason to impose one now. The trial court was correct in determining that the 1902 Act would have accomplished the disestablishment of the reservation as to unallotted lands had the lands been then opened. An additional factor relative to the 1902 Act was an addition to it providing for a tract of grazing land to be set apart for the common use of the Indians to meet the reasonable need of the Indians. This provision was added by a joint resolution on June 19, 1902 (32 Stat. 744). It in part provided:
 
 
 139
 "In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock."
 
 
 140
 This addition is significant in evaluating the 1902 Act and further demonstrates the status of the reservation lands before the opening.
 
 After the 1902 Act
 
 141
 The Indian consent required by the 1902 Act was not forthcoming within the time limit to make the allotments, and Congress had to take further action. However, the matter was influenced in a very substantial way by the decision of the Supreme Court in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), decided January 5, 1903. The Court there held that Congress could unilaterally change Indian reservations; that no tribal or Indian consent was required; and that there was no contractual relationship between the Government and the tribe arising from the establishment of a reservation. As is apparent, this had significant implications on what Congress was trying to accomplish as to this reservation and as to others.
 
 
 142
 In another appropriation act Congress by the Act of March 3, 1903 (32 Stat. 982) again extended the time for opening the unallotted lands for entry as provided in the 1902 Act, and eliminated any reference to consent of the Indians.
 
 
 143
 In 1904, Congress again extended in an appropriation act the time for the opening to March 10, 1905 so that surveying could be completed and allotments made. Act of April 21, 1904, 33 Stat. 189, 207.
 
 
 144
 The trial court held, and the parties do not dispute on appeal, that the 1903 and 1904 Acts did not affect the operative terms of the 1902 Act. I agree.
 
 
 145
 The time set by the 1904 Act for allotments to be completed (March 10, 1905) was running out and Congress again used an appropriation act to extend the time. However, there were added this time some new provisions by this Act of March 3, 1905 (33 Stat. 1048). There were provided more details as to the opening of the unallotted lands for entry, and restrictions were added as well which were of significance.
 
 This 1905 Act in part provided:
 
 146
 "That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the act of Congress of May twenty-seventh, nineteen hundred and two, shall be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof;
 
 
 147
 "That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: Provided, That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the act opening the reservation." (Emphasis in original.)
 
 The Relationship of the 1902 and 1905 Acts
 
 148
 This court considered the relationship of the various enactments concerning the Uintah reservation and certain issues regarding the status of the unallotted lands in Hanson v. United States, 153 F.2d 162 (10th Cir.). We there concluded that the issue had to be decided under the 1902 Act, and that the 1905 Act merely extended the date of opening of the reservation and did not affect the operative terms of the 1902 Act.
 
 
 149
 What is advanced as "limitations" on disposition in the 1905 Act is the provision that the unallotted lands were to be disposed of under "the general provisions of the homestead and town-site laws, ... and shall be opened to settlement and entry by proclamation of the President." The 1905 Act does not specifically utilize or repeat the "public domain" language of the 1902 Act.
 
 
 150
 The provision that the lands be opened under the homestead and townsite laws does not constitute a substantial restriction which militates against the conclusion that the public domain intent in the 1902 Act was carried over into the 1905 Act. The limitation in the Rosebud opening is comparable as is Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (1913). The provisions considered in Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), and in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), do not lead to a contrary conclusion. In the case before us the provisions in the prior acts dictated the public domain conclusion under the 1905 Act.
 
 
 151
 Nothing in the Congressional debates suggests an attempt to change the 1902 intent. See 39 Cong.Rec. 1181-85, January 21, 1905. Rather, Congress was concerned in 1905 with the possibility that land speculators would deprive actual homeseekers of the choicest land. "Indian Appropriations Bill, 1906," Hearings, Subcomm. of the Sen. Comm. of Ind. Aff., 58th Cong., 3d Sess. (1905).
 
 
 152
 The intent of the 1905 Act was thus to effect the restoration of the unallotted lands to the public domain and to allow entry under the homestead and townsite laws to prevent speculation.
 
 
 153
 Evidence of this intent can be found in the Committee Report to S. 6867 in 1905, a bill which used language virtually identical to that found in the 1905 Act. There the report included letters from the Commissioner of Indian Affairs and from the Commissioner of the General Land Office which referred to the lands as being in the public domain or as public lands. S.Rep. No. 4240, 58th Cong., 3d Sess. (1905).
 
 
 154
 It is difficult to accept the argument that limitations on the manner of entry necessarily vitiate Congressional intent to disestablish the reservation in view of the Gilsonite Strip withdrawal herein considered. There, some 7,000 acres were restored to the public domain subject to a limitation on disposition to purchase with a maximum number of acres. As I have noted, neither party disputes that the strip was removed from reservation status. Thus limitations on entry are not necessarily inconsistent with the disestablishment. As mentioned in the Rosebud opinion Congress knew what operative words were needed to accomplish the purpose.
 
 
 155
 As mentioned, the changes were accomplished by a series of provisions contained in Indian appropriation acts of 1902, 1903, 1904 and 1905. Each act built on the ones before, and especially by "extending" the time for opening from those provided before. This shows a continuous process brought about by the delays encountered on the ground. The acts also did not seek to expressly amend the prior act but, as mentioned, built on the one before. This prevails as to matters other than time "extensions." There were several express repeals, but only as to specific elements which were not of significance. Thus there were no general repeals but only additions of items here of concern. This cumulative series of enactments should be compared to the position taken by the Supreme Court in Rosebud, as I have already mentioned. There an agreement that failed to be ratified by Congress in 1901 could be considered in determining the intent of a 1904 Act. The 1904 Act or agreement indicated continuity of purpose and language with the 1901 attempt. The 1901 agreement showed "an unmistakable baseline purpose of disestablishment." Rosebud, at 592, 97 S.Ct. at 1366. This same demonstration of continuity is present in the case before us and the 1902 Act does also show a "baseline purpose of disestablishment." Again, the persuasiveness is greater here because the earlier language was in acts that passed both Houses and not in bills that failed.
 
 
 156
 Even if it were not clear from the terms of the 1905 Act and its legislative history that the 1905 Act was not intended to affect the substantive terms of the 1902 Act, 39 Cong.Rec. 3868, 3919, 39 Cong.Rec. 1181-83, the contemporaneous and subsequent legislative and administrative treatment of the unallotted lands confirms that they were part of the public domain.
 
 
 157
 The most important indication of the effect of the 1905 Act is President Roosevelt's Proclamation of July 14, 1905 which stated, in relevant part:
 
 
 158
 "Whereas it was provided by the Act of Congress, approved May 27, A.D., 1902 (32 Stat., 263), among other things, that on October first, 1903, the unallotted lands in the Uintah Indian Reservation, in the State of Utah, 'shall be restored to the public domain: Provided, That persons entering any of said lands under the homestead laws shall pay therefor at the rate of one dollar and twenty-five cents per acre'.
 
 
 159
 "And, whereas, the time for the opening of said unallotted lands was extended to October 1, 1904, by the Act of Congress approved March 3, 1903 (32 Stat., 998), and was extended to March 10, 1905, by the Act of Congress approved April 21, 1904 (33 Stat., 207), and was again extended to not later than September 1, 1905, by the Act of Congress, approved March 3, 1905 (33 Stat., 1069), which last named act provided, among other things:
 
 
 160
 ....
 
 
 161
 "Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that all the unallotted lands in said reservation, excepting such as have at that time been reserved for military, forestry and other purposes, and such mineral lands as may have been disposed of under existing laws, will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States...."
 
 
 162
 Presidential Proclamation of July 14, 1905, 34 Stat., pt. 3, 3119.
 
 
 163
 The lands were to be opened by a presidential proclamation, and of great significance in any determination of the intent of Congress is the executive implementation of the legislation. The proclamation is very similar in all significant respects to the Rosebud proclamation. This proclamation, with its references and adoption of terms from the 1902 Act, in my view demonstrates the continuation of the 1902 provisions, and confirms the public domain status of the unallotted lands. The proclamation is "an unambiguous, contemporaneous, statement, by the Nation's Chief Executive, of a perceived disestablishment" of the reservation. Rosebud Sioux Tribe v. Kneip, 430 U.S. at 602-03, 97 S.Ct. at 1371-72.
 
 
 164
 A further indication that the unallotted lands were no longer part of the reservation after it was opened is the subsequent restoration of some of those lands to reservation status for the Utes. Much if not all of the unallotted lands on the original Uintah reservation which had not been disposed of under the public land laws were restored in 1945. The Order of Restoration recites that "pursuant to the provisions of the act of May 27, 1902 (32 Stat. 263)" the unallotted lands were made subject to disposal under the laws applying to public lands. As indicated this restoration acknowledges that the opening was under the 1902 Act. Section 3 of the Reorganization Act provides that the Secretary of the Interior is authorized "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened." Act of June 18, 1934, 73rd Cong., 2d Sess., Sec. 3. Neither party disputes that the restorations accomplished pursuant to Sec. 463 of 25 U.S.C. made them part of the reservation. I agree. This restoration included about 217,000 acres.
 
 
 165
 Much later administrative treatment of the unallotted lands also confirms the proposition that those lands were restored to the public domain. See, e.g., Opinion of the Solicitor of the Department of the Interior, January 27, 1947, 59 I.D. 393 (unallotted lands were "restored to the public domain pursuant to the Act of May 27, 1902, as amended.... Although the lands were restored to the public domain, they were subject to disposition only under the Act of May 27, 1902, as amended." Id. at 393, 394); Letter from the Commissioner of Indian Affairs to the Secretary of the Interior, June 19, 1941.
 
 
 166
 The largest single addition occurred in 1948 when Congress added the Hill Creek Extension of some 510,000 acres of the former Uncompahgre reservation to the Uintah and Ouray reservation. Act of March 11, 1948, ch. 108, 62 Stat. 72.
 
 
 167
 I have also examined the maps introduced by the parties and the governmental statistics setting forth the acreage of the reservation and find them to support the position taken by the counties and cities. Statements made by the Utes themselves also tend to detract from their position. For example, the 1957 Ute Ten Year Development Program provides a description of the total acreage of the Uintah and Ouray reservation as currently containing 1,010,000 acres. In detail, it delineates, "The original area of the Uintah Reservation in Wasatch, Duchesne and Uintah Counties were reduced as follows...." (The document then details the Gilsonite Strip reduction, the 1905 addition to the Uintah Forest Reserve, the Strawberry River reduction, the 1902 grazing reserve and allotments to individual Indians and "[a]pproximately 798,877 acres were disposed of by the United States for cash, or otherwise set aside and taken for its own use at various times since the opening of the reservation in 1905.") The statistics of the Office of Indian Affairs show similar figures.
 
 
 168
 Both parties have introduced substantial evidence regarding administrative and legislative appellations to the "current" or "former" status of the reservation. My review of those references evinces no discernible Congressional intent one way or the other. There is simply no consistent, clear and uniform identification of the reservation's status in the subsequent legislative record. Analysis of the newspaper accountings of the events occurring on the reservation is similarly opaque.
 
 
 169
 Thus, after closely examining the record as it relates to the unallotted lands, I must conclude that the trial court erred in holding that the unallotted lands were not returned to the public domain pursuant to the 1902 Act.
 
 
 170
 Other Issues--Pre-opening Withdrawals Forest Reserve Lands
 
 
 171
 Besides extending the time of entry under the 1902 Act and describing the entry thereunder, the 1905 Act also provided that before the opening the President was authorized to set apart and reserve lands in the reservation as an addition to the Uintah Forest Reserve. 33 Stat. 1070. Specifically, the Act states:
 
 
 172
 "That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules and regulations governing forest reserves, ... such portion of the lands within the Uintah Indian Reservation as he considers necessary...."
 
 
 173
 By proclamation, President Theodore Roosevelt withdrew 1,010,000 acres from the Uintah reservation for that purpose. Proclamation of July 14, 1905, 34 Stat. pt. 3, 3116. The reserve was created pursuant to specific authority under the 1905 Act and the general authority he already had.
 
 
 174
 The trial court found that the presidential forest reserve proclamation extinguished those portions of the reservation included therein. On appeal, the Utes argue that the statutory language of the 1905 Act and the contemporaneous legislative history did not extinguish the reservation boundaries nor did Congress ever enact subsequent legislation to extinguish the Utes' title. In the proclamation creating the forest reserve out of the reservation lands it was expressly provided that the reserve be an addition to the Uintah Forest Reserve which theretofore existed. The addition was to be "subject to the laws, rules, and regulations governing forest reserves."
 
 
 175
 My review of the 1905 Act, the presidential proclamation, the pertinent legislative history and the subsequent treatment of the subject lands convinces me that the forest reserve lands are not part of the reservation. No express language of termination of Indian jurisdiction over the Forest Service lands or an express extinguishment of the reservation boundaries was required. As I noted previously the Supreme Court has held that the "clear language of express termination" is not a required talisman for termination or disestablishment. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 588 n. 4, 97 S.Ct. 1361, 1364 n. 4, 51 L.Ed.2d 660 (1977). The authority was present and was exercised to so change the land status from reservation lands to public forest reserves. The administrative authority over the lands was transferred from the Secretary of the Interior to the Secretary of Agriculture pursuant to the Act of February 1, 1905, ch. 288, 33 Stat. 628, and subjected the Forest Service lands to an entirely different regulatory regime. By transferring of reservation status to the status of the Forest Service lands thus for public use and by shifting the administrative authority over them, Congressional intent to remove the lands from the reservation is clearly evidenced.
 
 
 176
 My view that Indian jurisdiction is inconsistent with the land's status as forest reserve land is consonant with recent holdings by the Court of Claims and the Ninth Circuit. Both courts held that the designation of land as a forest reserve is itself effective to extinguish Indian title. United States v. Pueblo of San Ildefonso, 513 F.2d 1383, 1386, 1391-93, 206 Ct.Cl. 649 (1975); United States v. Gemmill, 535 F.2d 1145 (9th Cir.1976). The Ninth Circuit went on to find that "any ambiguity about extinguishment that may have remained after the establishment of the forest reserves, has been decisively resolved by congressional payment of compensation to the ... Indians for these lands." Id. at 1149. The Utes received $1,217,000.00 in compensation. The situation before us is very similar as Congress added to a forest reserve by removing lands from an Indian reservation and later compensating the Indians for the lands. The trial court was correct in finding that the 1,010,000 acres withdrawn pursuant to the July 14, 1905 presidential proclamation were no longer part of the Uintah reservation.
 
 The Strawberry River Reclamation
 
 177
 The third major part of the 1905 Act authorized the President before the reservation was opened to "set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development." President Roosevelt withheld from disposal 56,000 acres along the Strawberry River for reclamation purposes pursuant to that authority in August 1905. Presidential Proclamation of August 3, 1905, 34 Stat. pt. 3, 3141.
 
 
 178
 Five years later, Congress compensated the Utes for the Strawberry River lands and clearly extinguished any Indian interest in the lands by providing that "[a]ll right, title, and interest of the Indians in the said lands are hereby extinguished, and the title, management and control thereof shall pass to the owners of the lands irrigated from said project...." Act of April 4, 1910, 36 Stat. 269, 285.
 
 
 179
 Neither side disputes the trial court's holding that the reservation was diminished to the extent of the 56,000-acre Strawberry River withdrawal.
 
 
 180
 The withdrawal of lands for the Strawberry River irrigation project does not give rise to any implication that the unallotted lands remained part of the reservation. The Strawberry River lands were set apart and reserved on August 3, 1905, over three weeks prior to the opening of the reservation on August 28, 1905. Affirmative action to remove the Strawberry River lands from the reservation was then necessary because the reservation had not yet been opened. The Strawberry River withdrawal has no bearing on the status of lands which were subsequently to be opened to the public domain.
 
 
 181
 I must repeat that these issues must be considered in the context of the aims of Congress at the time the legislation was enacted, and what was then sought to be accomplished. It is easy to apply later views and policies, but this should not be done. The then prevailing aims and purposes are well documented in the legislative history, and we should not now seek to apply current standards. Also, the application of then established public land law and the prevailing use and meaning of its terms are essential.
 
 CONCLUSION
 
 182
 I would:1. Affirm the trial court's holding that the original Uncompahgre reservation was disestablished by Congress pursuant to the Act of June 7, 1897 and no longer exists.
 
 
 183
 2. Affirm the trial court's holding that prior to August 28, 1905, the original boundaries of the Uintah Valley Indian reservation were diminished by Congress through the withdrawal of the Gilsonite Strip in 1888, by the withdrawal of 1,010,000 acres subsequently made part of the Uintah National Forest, and by the withdrawal of approximately 56,000 acres for the Strawberry River irrigation project.
 
 
 184
 3. Affirm the trial court's finding that the 510,000-acre Hill Creek Extension was incorporated within the Uintah and Ouray Indian reservation.
 
 
 185
 As to the Uintah Valley reservation, I would reverse the holding of the trial court that the unallotted lands at the opening remained part of the reservation. Instead it is my view that the then unallotted lands lost all reservation status, became part of the public domain, and were not within the reservation for any purpose when the reservation was opened, subject only to the special tracts herein discussed set apart for specific uses before the land was opened, and subject to valid mineral claims specifically provided for in the Acts of 1902, 1903, 1904 and 1905 and valid claims made under the general mining laws.
 
 
 186
 BARRETT, Circuit Judge, joins in this dissenting opinion.
 
 
 
 [1]
 The brief submitted by the Cities and Counties suggests that the 1905 Act necessarily diminished the Uintah Reservation because BIA personnel and local residents immediately thereafter began referring to the "former" Reservation. These contemporaneous interpretations of the Act are entitled to little weight. Congress' authority over reservations is plenary, Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903), and it is Congress' intent that must govern our decision. The interpretation, wishful or not, given to the 1905 Act by whites living in the Reservation area cannot overcome the lack of compelling evidence that Congress intended to diminish the Uintah Reservation
 
 
 [2]
 The applicable forest service laws mentioned in the 1905 Act are limited by 16 U.S.C. Sec. 480, which provides that criminal and civil jurisdiction is not affected by the existence of a national forest. Thus, Indian jurisdiction does extend to Indians on forest lands
 
 
 [3]
 Sec. 20. That the President of the United States is hereby authorized and directed to appoint a commission of three persons to allot in severalty to the Uncompahgre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands according to the treaty of eighteen hundred and eighty, as follows:
 Allotments in severalty of said lands shall be made as follows: To each head of a family one-quarter of a section, with an additional quantity of grazing land not exceeding one-quarter of a section; to each single person over eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each other person under eighteen years of age, born prior to such allotment, one-eighth of a section, with a like quantity of grazing land: Provided, That, with the consent of said commission, any adult Indian may select a less quantity of land, if more desirable on account of location: And Provided, That the said Indians shall pay one dollar and twenty-five cents per acre for said lands from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their contract with the Government. All necessary surveys, if any, to enable said commission to complete the allotments shall be made under the direction of the General Land Office. Said commissioners shall, as soon as practicable after their appointment, report to the Secretary of the Interior what portions of said reservation are unsuited or will not be required for allotments, and thereupon such portions so reported shall, by proclamation, be restored to the public domain and made subject to entry as hereinafter provided.
 Sec. 21. That the remainder of the lands on said reservation, shall, upon the approval of the allotments by the Secretary of the Interior, be immediately open to entry under the homestead and mineral laws of the United States: Provided, That no person shall be entitled to locate more than two claims, neither to exceed ten acres, on any lands containing asphaltum, gilsonite, or like substances. Provided, That after three years actual and continuous residence upon agricultural lands from date of settlement the settler may, upon full payment of one dollar and fifty cents per acre, receive patent for the tract entered. If not commuted at the end of three years the settler shall pay at the time of making final proof the sum of one dollar and fifty cents per acre.
 Sec. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, and if possible, procure the consent of such Indians to such relinquishment, and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress.
 
 
 [1]
 The General Allotment Act of 1887, ch. 119, 24 Stat. 388, gave the President discretion to allot reservation lands to resident Indians and, with tribal consent, to sell surplus lands. A transitional act, it maintained the reservation system but tried to facilitate the allotment process. The Act envisioned the abolition of the reservation system only after this process was complete. See Mattz v. Arnett, 412 U.S. 481, 496-97, 93 S.Ct. 2245, 2253-54, 37 L.Ed.2d 92 (1973). Congress later enacted specific legislation to assure the opening of a particular reservation. Id. at 497, 93 S.Ct. at 2254
 
 
 [2]
 The record on appeal includes a Joint Compendium of Legislative Documents including Executive Orders, Presidential Proclamations, and certain Secretarial Orders, compiled and used by the district court. See Rec., vol. XI, XII. In addition to formal citation form, these sources are referred to parenthetically by their corresponding compendium index numbers, LD 1 to LD 217
 
 
 [3]
 Solem cautions that the Court has "never been willing to extrapolate from this expectation [of demise of the reservation system] a specific congressional purpose of diminishing reservations with the passage of every surplus land act." Solem, 104 S.Ct. at 1165. Nor will diminishment be "lightly inferred." Id. at 1166
 
 
 [4]
 The terms of the 1894 Act were never fulfilled and the effort to impose the Act on the Uncompahgres was dropped in 1896. See S.Doc. No. 32, 55th Cong., 1st Sess. 2 (1897) (LD 46). The 1897 Act is the critical one before us, and I can see no reason to infer a baseline purpose of disestablishment from the ambiguous terms of the unrealized 1894 Act
 
 
 [5]
 As did congressional debate, negotiations with the Indians focused on whether they would have to pay for their allotments. This requirement was eventually dropped, but the agreement to participate in the allotment program does not imply an understanding that the reservation boundaries would disappear
 
 
 [6]
 The order did withhold the land from sale, presumably to permit the completion of the allotment process. The 1894 and 1897 Acts would have been needed in any event to reopen the land for sale to non-Indians. It became clear that the legislation was necessary to spur the stalled allotment process. By the 1890s, Congress was also under pressure to open the land to permit mining interests to enter
 
 
 [7]
 The fact that the Uncompahgres did not own the land within their reservation explains why members of Congress and others considered the Uncompahgres to be in a different position than the Uintahs, who did hold title to the land within their reservation. It also explains why the United States did not have to pay the Uncompahgres for the land subsequently opened to the public. That the Uncompahgres only had temporary occupancy rights within the reservation before they received their allotments, however, does not undermine their claim that the jurisdictional boundaries were never extinguished, given the distinction between title and jurisdiction
 
 
 [8]
 16 U.S.C. Sec. 480 (1982) provides:
 "The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their existence ...; the intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State."